# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

JES PROPERTIES, INC. d/b/a CYPRESS
TRAILS FARM, a Florida corporation,
and MICHAEL W. GALLAGHER,

Plaintiffs,

-vs-                                                          Case No.  8:02-cv-1585-T-24MAP

USA EQUESTRIAN, INC. (formerly
the American Horse Show Association), et al.,

Defendants.

_____/

# O R D E R

This cause comes before the Court for consideration of the following motions: Defendant

United States Equestrian Federation, Inc.'s ("USEF") Motion for Summary Judgment and

Request for Oral Argument (Doc. No. 287); Defendants', David E. Burton, Sr., David E. Burton,

Jr., Burton and Sons, Inc. and Littlewood Fences, Inc. (collectively, "the Burton Defendants"),

Motion for Summary Judgment (Doc. No. 290); Defendants', Thomas Struzzieri ("Struzzieri"),

Horse Shows in the Sun, Inc. ("HITS") and Rose View Stables, Ltd. ("Rose View

Stables")(collectively "the HITS Defendants"), Motion for Summary Judgment (Doc. No. 292)

and Defendants, Stadium Jumping, Inc. ("Stadium Jumping") and Eugene R. Mische

("Mische)(collectively, "the Stadium Jumping Defendants"), Motion for Entry of Final Summary

Judgment (Doc. No. 294).[1]  The Court shall refer to the Burton Defendants, the HITS Defendants

---

[1]The Court notes that the only other remaining Defendants, Linda S. Aldrich and Fox Lea
Farm, Inc. did not file dispositive motions.  Several Defendants, USA Equestrian Trust, Inc., f/k/a
(continued...)

and the Stadium Jumping Defendants collectively as the "Promoter Defendants."  With leave of

the Court, Plaintiffs filed a Combined Response to Defendants' Summary Judgment Motions

(Doc. No. 317)(hereinafter "Response to Motions for Summary Judgment").  With leave of the

Court, USEF filed a Reply Brief on the Limited Issue of Antitrust Immunity (Doc. No. 343) and

Plaintiffs filed a Sur-Reply to USEF's Reply on the Limited Issue of Antitrust Immunity (Doc.

No. 344).

> **I.      Procedural History**

On August 29, 2002, Plaintiffs filed a three-count Complaint which raised claims of

unreasonable restraint of trade under section 1 of the Sherman Act (Count I), monopolization

and attempted monopolization under section 2 of the Sherman Act (Count II), and claims of

conduct, practices and activities which have the likelihood of substantially lessening competition

under section 7 of the Clayton Act (Count III).  Upon Defendants' motions this Court dismissed

the Complaint, but granted Plaintiffs leave to amend (Doc. No. 39).

On April 18, 2003, Plaintiffs filed a nine-count Amended Complaint (Doc. No. 42) in

which they alleged claims for violation of Section 1 of the Sherman Act, violation of Section 2

of the Sherman Act, violation of Florida's Antitrust Act and violation of the Florida Deceptive

and Unfair Trade Practices Act.  In the Amended Complaint, Plaintiffs also added an additional

---

[1](...continued)
USA Equestrian, Inc. ("USAE")(formerly The American Horse Shows Association, Inc.("AHSA")),
Bob Bell, Classic Company Ltd., Kernan Hodges a/k/a Mrs. George H. Hodges, Jr. and North
Florida Hunter & Jumper Association, Inc. apparently settled with the Plaintiffs and have been
dismissed from the case (Doc. Nos. 195, 261, 267 and 350).

Defendant, North Florida Hunter & Jumper Association, Inc. ("NFHJA").  On October 10, 2003, this Court denied Defendants' Motions to Dismiss the First Amended Complaint (Doc. No. 59).[2]

On December 19, 2003, Plaintiffs sought leave to file a fourteen count Second Amended Complaint to add Eugene R. Mische, Stadium Jumping, Inc., Thomas E. Struzzieri, Horse Shows in the Sun, Inc., Linda S. Aldridge, Fox Lea Farm, Inc., and United States Equestrian Federation, Inc. ("USEF") as additional defendants (Doc. No. 77).  As Defendants did not oppose this second amendment, the Court granted Plaintiffs leave to file a Second Amended Complaint (Doc. No. 81).  In the Second Amended Complaint, Plaintiffs again alleged claims for violation of Section 1 of the Sherman Act, violation of Section 2 of the Sherman Act, violation of Florida's Antitrust Act and violation of the Florida Deceptive and Unfair Trade Practices Act.

Almost a year later, on December 16, 2004, Plaintiffs sought leave to file a Third Amended Complaint to add Roseview Stables Ltd. as an additional defendant (Doc. No. 250).  Again Defendants did not oppose this third amendment, and the Court granted Plaintiffs leave to file a Third Amended Complaint (Doc. No. 257).  In the Third Amended Complaint, Plaintiffs allege that the rules of USAE and USEF, more specifically, the "Mileage Rule,"[3] and Defendants' alleged refusal to waive application of that rule violate section 1 of the Sherman Act (Count I).  Counts II - IV raise claims of monopolization, attempted monopolization, and

---

[2]The Court notes that as to Plaintiff Gallagher, the Court granted without prejudice the Burton Defendants' Motion to Dismiss the First Amended Complaint since Plaintiff Gallagher did not allege compliance with "the Federation procedures and did not plead he sought a waiver of the Mileage Rule from the Burton Defendants" (Doc. No. 59).

[3]The Mileage Rule provides, in part, that in all States other than Maine, New Hampshire, Vermont, Connecticut, Rhode Island, New Jersey, New York and Pennsylvania, horse shows offering "A" rated hunter and jumper events must be held at least 250 miles apart on the same date. The Mileage Rule may be waived by a conflicting horse show promoter.

conspiracy to monopolize in violation of section 2 of the Sherman Act.  Counts V-VIII  raise

claims of violations of the Florida Antitrust Act, FLA. STAT. §§542.18 and 542.19. Count IX

alleges violations of the Florida Deceptive and Unfair Trade Practices Act.  USEF, the Burton

Defendants, the HITS Defendants and the Stadium Jumping Defendants now move for summary

judgment as to all counts of the Third Amended Complaint.

## II.    Factual Background[4]

This antitrust case arises from an unusual factual situation involving the sanctioning of

hunter and jumper horse show competitions in the state of Florida during the winter months.

USEF, a New York not-for-profit corporation, is the current[5] national governing body ("NGB")

for equestrian sport in the United States under the Ted Stevens Olympics and Amateur Sports

Act ("Amateur Sports Act" or "ASA"), 36 U.S.C. §§220501 et seq. (Doc. No. 289, Exh. 1, Long

Decl., ¶3 and Doc. No. 317, Exh. H, O'Connor Dep. p. 23).   USEF has over 80,000 members in

27 breeds and disciplines. (Doc. No. 305). USEF is not a promoter, operator, or manager of

horse shows.  (Doc. No. 289, Exh. 1, Long Decl., ¶17).   USEF did not exist prior to 2003 and has

been the NGB for equestrian sport in the United States since June 2004. (Doc. No. 289, Exh. 1,

Long Decl., ¶4).  USEF is a separate legal entity from USAE with its own ownership and

management. (Doc. No. 289, Exh. 1, Long Decl., ¶8).  Due in part to a delay in the Internal

---

[4]The Court will not restate the entire factual background of this case.  Instead, the Court incorporates by reference the factual background as outlined in the Court's Order granting the Burton Defendants, the Federation, the Bell Defendants and Defendant Hodges' Motions to Dismiss (Doc. No. 39) and the Court's Order denying Defendants' Motion to Dismiss the First Amended Complaint (Doc. No. 59).

[5]Replacing former NGB, USA Equestrian, Inc. ("USAE"), formerly known as the American Horse Show Assocation ("AHSA").  In its previous Orders, the Court referred to USAE as the Federation for that period prior to December 1, 2003.

Revenue Service's recognizing USEF's not-for-profit status, which is a requirement under the Amateur Sports Act for all NGBs, USEF entered into a Management and License Agreement ("Agreement") with USAE.  Under this Agreement, USEF carried out USAE's obligations as the NGB from December 2003 through May 2004, including processing applications for the current equestrian competition year (2005) on behalf of USAE. (Doc. No. 289, Exh. 1, Long. Decl., ¶5).

USEF, and predecessor NGBs, promulgated a variety of rules, including rules that sanction hunter and jumper horse shows as "Recognized Competitions."[6] (Doc. No. 305, GR208, pp. GR11 - GR12).  These rules are embodied in the 2005 USEF Rule Book.  (Doc. No. 305). Each Promoter Defendant agrees to abide by the rules as a condition of membership. (Doc. No. 305, GR210, pp. GR12 - GR13).  Recognized Competitions enjoy privileges not available to other competitions. (Doc. No. 305, GR209, p. GR12).  Plaintiffs allege that Recognized Competitions provide unique benefits to competitors and those who put on horse shows which are only available by repeat participation at such USEF-sanctioned shows.  Plaintiffs further allege that horse show promoters can benefit economically from holding Recognized Competitions.  (Doc. No. 317, Exh. K, Weiland Decl., ¶¶15 and 16).  The Mileage Rule which governs Recognized Competitions for hunter and jumper competitions rated "A" and above[7] ("A-Rated Shows") was implemented in 1975.  (Doc. No. 317, Exh. I, Balch Dep. p. 100).

In its current form, the Mileage Rule, for hunter and jumper Recognized Competitions in Group 2 states (which includes Florida), provides a "250-mile radius for competitions with any of the same A rated sections, or unrated Jumper sections and classes with total prize money of

---

[6]The Court notes that in their Third Amended Complaint the Plaintiffs utilize the term "Recognized Horse Shows."

[7]"A" or "AA."

$10,000 or more." (Doc. No. 305, GR214(2), p. GR16).  In the 1980's the Mileage Rule

applicable to the New England and Middle Atlantic states was reduced to a 125 miles radius.

(Doc. No. 305, GR214(1), pp. GR15 - GR16; Doc. No. 317, Exh. L, Swann Decl., ¶8 and Doc.

No. 317, Exh. L, Long Dep. p. 99).  Lesser mileage distances apply for "B" and "C" rated horse

shows. (Doc. No. 305, GR214(2), pp.GR15 - GR16).   USEF General Rule 214(7)[8], which

controlled the sanctioning of new A-Rated Shows during the course of the present litigation and

is part of the Mileage Rule, stated in relevant part:

> New competitions offering "A" rated hunter or jumper divisions or sections
> will not be recognized on dates conflicting with those of any other Recognized
> Competitions within the applicable distance specified by this rule which offers
> A rated hunter or jumper divisions or sections, regardless of class scheduling . . .
> The mileage restrictions . . . will not prevent two Hunter/Jumper competitions
> from being approved if the two competitions have different competition
> managements and the competition with priority gives written permission,
> to be renewed annually, and the mileage distance between the competitions
> is at least 10 miles.

(Doc. No. 305, GR214(7), pp.GR16 -GR17).

  USEF initially adopted the rules of the Federation as its own. (Doc. No. 289, Exh. 1,

Long Decl., ¶9).  In January 2004, the USEF Board created a task force to study the Mileage

Rule and related rules, and recommend appropriate changes, if any. (Doc. No. 289, Exh. 1, Long

Decl., ¶10).  In January 2005, USEF's Board passed several rule changes (the "January 2005 rule

changes")[9], including but not limited to: 1) giving USEF ultimate control over the granting or

denying of waivers under the Mileage Rule, and 2) enacting a "license agreement" regime under

which USEF has the right to refuse to renew applications of now-established competitions if

---

[8]Now amended.

[9]Effective May 1, 2005.

such competitions fail to satisfy certain objective standards. (Doc. No. 289, Exh. 1, Long Decl., ¶11 and Doc. No. 344, Exh. A.).  By way of example, although the Mileage Rule previously provided that a promoter of a horse show could, in its sole discretion, waive an objection to the holding of another similarly rated horse show within the applicable mileage restriction, new General Rule 213 provides, in relevant part: "The Federation shall reserve the right to have final approval on the granting or denying of waivers and will not delegate this responsibility to any other entities or parties."  (Doc. No. 289, Exh.1, Long Decl., Exh. C thereto and Doc. No. 344, Exh. A thereto).  No mileage restrictions apply to a horse show promoter who wishes to hold a horse show that is "unrated,"i.e., not sanctioned by the USEF. (Doc. No. 286, Struzzieri Decl., ¶4).

In their Third Amended Complaint, Plaintiffs define the relevant product market as "[h]unter and jumper equestrian competitions recognized by the Federation as hunter and jumper competitions 'A' rated and above." Third Am. Compl. ¶151.  They also define the relevant geographic market as the state of Florida between December 1 and March 31 of each year (the "Winter Months").  Third Am. Compl. ¶¶154 - 158.  Therefore, the Relevant Market is defined as A-Rated Shows in the state of Florida during the Winter Months. Third Am. Compl. ¶159.[10]

Plaintiffs are horse show promoters.  Dr. Douglas Weiland ("Weiland"), the principal of Plaintiff JES Properties, Inc. ("JES"), began holding unrecognized horse shows at his Cypress Trails Farm facility in Odessa, Florida in 1998.  (Doc. No. 317, Exh. K, Weiland Decl. ¶¶ 3 and

---

[10]For the limited purpose of ruling on Defendants' summary judgment motions this Court will accept that Plaintiffs' definition of the Relevant Market is correct. However, the Court notes that the Burton Defendants and HITS Defendants argue that the relevant product market should not be "A" rated hunter and jumper shows (Doc. Nos. 291 and 292).

4).  Weiland registered JES with USAE in 2000 and began to conduct Recognized Competitions during the summer months since no other promoters had conflicting dates in those months. (Doc. No. 317, Exh. K, Weiland Decl., ¶4).  Weiland held six A-Rated Shows at Cypress Trails Farm in the summers of 2001 and 2002,[11] and held 25 unrated shows between 1998 and 2003. (Doc. No. 317, Exh. K, Weiland Decl., ¶11).  Weiland intended to run A-Rated Shows in the Relevant Market if it was possible to do so.  (Doc. No. 317, Exh. K, Weiland Decl., ¶14). However JES was unable to obtain dates for A-Rated Shows in the Relevant Market due to the application of the Mileage Rule by the NGB and JES' inability to obtain waivers from the Promoter Defendants who controlled the dates. (Doc. No. 317, Exh. K, Weiland Decl., ¶¶21 - 23).  JES was actually unable to hold horse shows at the Cypress Trails Farm after 2003 due to zoning regulations.  (Doc. No. 317, Exh. K, Weiland Decl., ¶24).  However, Weiland alleges he would have conducted shows at other properties had he been able to obtain entry into the Relevant Market (Doc. No. 317, Exh. K, Weiland Decl., ¶25).

Plaintiff Gallagher ("Gallagher") conducted both A-Rated and unrated shows in the Tallahassee area.  (Doc. No. 317, Exh. O, Gallagher Decl. ¶¶ 8 - 10).  Gallagher alleges he has experience developing an equestrian facility in the Tallahassee area and has been approached about developing additional facilities and "residential communities surrounding them."  (Doc. No. 317, Exh. O, Gallagher Decl. ¶11).  Gallagher also has attempted to promote A-Rated Shows in the Relevant Market, but has been unable to obtain dates for A-Rated Shows in the Relevant Market due to the application of the Mileage Rule by the NGB and Gallaher's inability to obtain waivers from the Promoter Defendants who controlled the dates. (Doc. No. 317, Exh. O,

---

[11]The Court notes that it is unclear from the record whether Weiland held  six A-Rated Shows each summer or in total.

Gallagher Decl., ¶¶12 and 13).  Gallagher alleges that he has the financial backing needed to promote and manage A-Rated Shows. (Doc. No. 317, Exh. O, Gallagher Decl., ¶14).

The Burton Defendants conduct A-Rated Shows.  (Doc. No. 291, Exh. A., Burton, Sr. Dep. Vol. I p.141; Exb. B., Burton, Jr. Dep. p. 113).  None of the Burton Defendants were involved in the adoption of the Mileage Rule or related rules.  (Doc. No. 291, Exh. A, Burton, Sr. Dep. Vol. II pp. 12 -13; Exh. B., Burton, Jr. Dep. p. 130).  Cypress Trails Farm[12] unsuccessfully sought waivers of the Mileage Rule from each of the Burton Defendants.  (Doc. No. 291). Gallagher unsuccessfully sought waivers of the Mileage Rule from each of the Burton Defendants. (Doc. No. 291).  The decisions by each of the Burton Defendants not to grant waivers of the Mileage Rule were unilateral decisions. (Doc. No. 291, Exh. A, Burton, Sr. Dep. Vol. II pp. 52-68 and 77-79; Exh. B, Burton, Jr. Dep. pp.186 - 197).

Defendant Thomas E. Struzzieri ("Struzzieri") is the sole owner of Horse Shows in the Sun, Inc. ("HITS") and Rose View Stables, Ltd. ("Rose View Stables")(collectively "the HITS Defendants").  (Doc. No. 286, Struzzieri Decl., ¶2).  From 1998 through late 2002, Struzzieri was a member of the board of directors of USAE.  He was one of approximately 64 board members. (Doc. No. 286, Struzzieri Decl., ¶11).  In January 2005, Struzzieri became a board member of USEF.  (Doc. No. 289, Long Decl., ¶13).  From 1990 to the present, Struzzieri has been a member of the Competition Management Committee for USAE and USEF. (Doc. No. 286, Struzzieri Decl., ¶¶12 and 14).

Since 1981 the HITS Defendants have been holding and promoting horse shows throughout the United States, including shows in California, Arizona, Florida, New York,

---

[12]JES d/b/a Cypress Trails Farm.

Virginia and Massachusetts. (Doc. No. 286, Struzzieri Decl., ¶2).  For each of the last three (3) years, the HITS Defendants have held seven (7) hunter/jumper shows in the state of Florida at a facility in Ocala, Florida.  Of these seven (7) shows, five (5) were A-Rated Shows held on consecutive weeks in February and March.  The other two (2) horse shows were "unrated" hunter/jumper shows held in January. (Doc. No. 286, Struzzieri Decl., ¶5).  Except for the five (5) week period during the months of February and March, the HITS Defendants do not hold any USEF sanctioned horse shows in the state of Florida.

In 2003, the HITS Defendants received a Mileage Rule waiver request from Weiland, on behalf of JES.[13]  This was the first request for a waiver that the HITS Defendants had ever received from JES. (Doc. No. 286, Struzzieri Decl., ¶7).  JES failed to provide the HITS Defendants with specific details regarding the location of the contemplated show, and the waivers were not only for 2004 but for all years thereafter; therefore, the HITS Defendants did not provide JES with the waiver of the Mileage Rule. (Doc. No. 286, Struzzieri Decl, ¶7).  The HITS Defendants received a similar request from Gallagher and similarly did not provide Gallagher with the waiver. (Doc. No. 286, Struzzieri Decl., ¶8).  In 2004, the HITS Defendants again received waiver requests from Plaintiffs for show dates in February and March of 2005. The HITS Defendants again decided not to grant such requests based upon the fact that the Plaintiffs had filed this lawsuit against the HITS Defendants (Doc. No. 286, Struzzieri Decl., ¶17).

---

[13]The dates that were subject to JES' request were February 4-8, 2004, February 11 - 15, 2004, February 18  - 22, 2004, February 25 - 29, 2004, March 3-7, 2004 and March 10 - 14, 2004. (Doc. No. 286, Struzzieri Decl., ¶7).

Defendant Stadium Jumping first received a Mileage Rule waiver request from JES in May 2003.[14] (Doc. No. 293, Mische Decl., ¶2).  On May 12, 2003, Defendant Stadium Jumping responded to JES by denying JES' waiver request.  (Doc. No. 293, Mische Decl., ¶3). Defendant Stadium Jumping elected not to respond to subsequent waiver requests received from JES.  (Doc. No. 293, Mische Decl., ¶¶6, 9 and 12).  Defendant Stadium Jumping received similar requests from Gallagher and similarly did not provide Gallagher with waivers or respond to his requests. (Doc. No. 293, Mische Decl., ¶¶8, 9 and 12).  Defendant Stadium Jumping's decisions not to grant waivers of the Mileage Rule, or respond to Plaintiffs' requests, were unilateral decisions. (Doc. No. 293, Mische Decl., ¶¶4,6,9, and 12).

Defendant Eugene R. Mische ("Mische") personally, or in the name of Defendant Stadium Jumping, has been a member of USEF and its predecessor organizations for more than thirty (30) years.  Mische states that other than a *de minimis* role based on his being a member of USEF, he had no actual role in the institution or development of the Mileage Rule. (Doc. No. 293, Mische Decl., ¶13).  Mische further claims that in the past, Defendant Stadium Jumping has granted Mileage Rule waivers to promoters, including Defendant Horse Shows in the Sun and Defendant Burtons & Sons, Inc.  These waivers "were granted by Stadium Jumping without being conditioned on giving, or not giving, any future 'waivers' or permissions to those promoters or any other promoters who might make such requests in the future."  (Doc. No. 293, Mische Decl., ¶14).

---

[14]The dates that were subject to JES' request were February 5-9, 2003, February 12 - 16, 2003, February 19 - 23, 2004, February 26 - March 3, 2003, March 5-9, 2003, March 13 - 16, 2003, March 19 - 23, 2003 and March 25 - 29, 2004 (Doc. No. 293, Mische Decl., Exh. A).

The Promoter Defendants do not control or dictate USEF policies and rules. (Doc. No. 289, Exh.1, Long Decl., ¶15 and Doc. No. 293, Mische Decl., ¶15).  Rather, the power to make and change USEF rules is placed by USEF's bylaws with USEF's fifty-four member Board of Directors. (Doc. No. 305, pp. ix - x).  Of the fifty-four Board of Directors  members, only ten (two of whom are athlete seats mandated by the Amateur Sports Act), represent the hunter and/or jumper communities. (Doc. No. 305, pp. x - xi and Doc. No. 289, Long Decl., ¶13).  Only Defendant Struzzieri is currently a board member of USEF. (Doc. No 289, Long. Decl., ¶13).  Furthermore, USEF committees, such as the Competition Management committee, have no power to make or change USEF rules but can only make recommendations for rule changes to the Board of Directors. (Doc. No. 305, p. xxix; Doc. No. 289, Long Decl., ¶14 and Doc. No. 286, Struzzieri Decl., ¶14).

### III.     Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case.  Id. at 325.  Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim.  See id.  When a moving party has discharged its burden, the non-moving party must

then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial.  Id. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor.  See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the
> universe of possible inferences from the facts established by weighing each
> against the abstract standard of reasonableness."  [citation omitted].  The
> opposing party's inferences need not be more probable than those inferences
> in favor of the movant to create a factual dispute, so long as they reasonably
> may be drawn from the facts.  When more than one inference reasonably can
> be drawn, it is for the trier of fact to determine the proper one.

WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion.  See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988).  A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

## IV.    Discussion

The question before this Court is whether there are grounds for relief under the antitrust laws based upon the alleged anticompetitive impact of the Promoter Defendants' adherence to the rules promulgated by the national governing body of equestrian sport in the United States. Plaintiffs have asserted claims against the Promoter Defendants and USEF based upon Plaintiffs' inability to obtain permission to hold or promote A-Rated Shows in Florida between December 1 and March 31.  The crux of Plaintiffs' claims is that the Promoter Defendants illegally use USEF's rules to insulate themselves from economic competition in the horse show industry. Specifically, as a result of the Promoter Defendants' adherence to USEF's rules,  Plaintiffs argue that "at least one incumbent promoter of an A-Rated Show exists for every winter weekend in Florida, preventing any other promoters from entering the market and engaging in head-to-head competition within the 250-mile radius" (Doc. No. 317).  By way of example, Plaintiffs contend that "the 250 mile radius prevents A-Rated Shows from being held in the Tampa, Orlando or Jacksonville metro areas if a similar show is being held in the Palm Beach County area, unless the incumbent promoter grants a waiver" (Doc. No. 317).  Plaintiffs refer to the Promoter Defendants' alleged illegal conduct as granting them  "perfect and permanent serial monopolies for their protected dates" (Doc. No. 317).

### 1.    Ted Stevens Olympics and Amateur Sports Act, 36 U.S.C. §§ 220501 et seq.

USEF argues that it is exempt from antitrust liability for the subject Mileage Rule under the Ted Stevens Olympics and Amateur Sports Act, 36 U.S.C. §§220501 et seq.  (the "Amateur Sports Act" or "ASA").  The Promoter Defendants all contend that since USEF enjoys antitrust implied immunity in connection with the establishment and enforcement of the Mileage Rule,

they should likewise be immune from antitrust liability for exercising their right not to waive the application of the rule.  Plaintiffs respond that there is no support in the case law for such an expansive view of implied antitrust immunity.  Plaintiffs further contend that while USEF may be the NGB for equestrian sport, the Mileage Rule is not necessary for any of the core functions of the NGB and serves no legitimate purpose.

The Amateur Sports Act was enacted "to correct the disorganization and serious factional disputes that seemed to plague amateur sports in the United States."  San Francisco Arts & Athletics, Inc. v. United States Olympic Comm'n, 483 U.S. 522, 544 (1987)(citations omitted). Under the Amateur Sports Act, the United States Olympic Commission ("USOC") is authorized to recognize one NGB for each sport included in the program of the Olympic Games.  As the recognized NBG for equestrian sport in the United States, USEF is mandated to regulate the sport.  The Amateur Sports Act provides in relevant part:

> (a)  Authority.–For the sport that it governs, a national governing body may --
> (1)  represent the United States in the appropriate international sport federation;
> (2)  establish national goals and encourage the attainment of those goals;
> (3)  serve as the coordinating body for amateur athletic activity in the United States; . . .
> (6)  recommend to the corporation[15] individuals and teams to represent the United States in the Olympic Games . . ..

36 U.S.C. §220523.

> For the sport that it governs, a national governing body shall  --
>
> (1)  develop interest and participation throughout the United States and be responsible to the persons and amateur sports organizations it represents;
> (2)  minimize, through coordination with other amateur sports organizations, conflicts in the scheduling of all practices and competitions . . ..

---

[15]The USOC.

36 U.S.C. §220524.

To the extent that courts have considered antitrust challenges to rules defining professional sports activities, the rulemaking authorities have been given considerable discretion to achieve their sporting objectives, in the absence of any demonstrated market foreclosure.  See Brookins v. Int'l Motor Contest Ass'n, 219 F.3d 849, 853 (8th Cir. 2000).  While the Amateur Sports Act does not expressly exempt amateur sports activities from the antitrust laws, courts have found implied antitrust immunity.  See Behagen v. Amateur Basketball Ass'n of the United States, 884 F.2d 524 (1989).  USEF argues that because §220524(2) of the Amateur Sports Act confers on USEF an obligation to minimize scheduling conflicts, USEF is entitled to antitrust immunity with respect to the Mileage Rule.  This Court Agrees.

In Behagen, a former amateur basketball player, Ronald Behagen ("Behagen") lost his amateur eligibility status[16] after playing professional basketball for a second time.  The ABA/USA, the NGB for basketball, had enacted a player eligibility rule that provided that an athlete could reclaim amateur status only once after playing professional basketball.  When Behagen's amateur status was not reinstated, he brought suit alleging in part that the player eligibility rule constituted an illegal group boycott under section 1 of the Sherman Antitrust Act ("Sherman Act").  See Behagen, 884 F. 2d at 527.  The Tenth Circuit reversed a jury verdict in favor of Behagen on the Sherman Act claim.  In finding the player eligibility rule exempt from the coverage of the federal antitrust laws, the Court stated "[t]he defendants' actions in this case were clearly within the scope of activity directed by Congress, and were necessary to implement

_____

[16]In order for an American to play basketball in amateur competition outside of the United States, the player is required to qualify as an amateur by receiving a travel permit from the Amateur Basketball Association of the United States ("ABA/USA") and a license from the Federation Internationale de Basketball Amateur ("FIBA")

Congress' intent with regard to the governance of amateur athletics." Id.  The Court further stated that "the monolithic control exerted by an NGB over its amateur sport is a direct result of the congressional intent expressed in the Amateur Sports Act." Id. at 528.

As the NGB for equestrian sport in the United States, USEF performs many functions including the promulgation of scheduling and competition rules such as are at issue in the present case.  The Amateur Sports Act requires USEF, as the NGB for equestrian sport, to coordinate amateur equestrian activity in the United States and to minimize scheduling conflicts. See 36 U.S.C. §§220524(2) and 220523(a)(3).  Plaintiffs concede that USEF promotes the equestrian sport, including the publication of rules and standards for participation, rider and animal safety and judging at competitive shows.  Third Am. Compl. ¶35.  At the very heart of Plaintiffs' lawsuit is their desire to have A-Rated Shows in the Relevant Market sanctioned by USEF and have the ability to utilize the rules of USEF.

Scheduling is central to the governing of any sport.  USEF argues that "the Mileage Rule is a scheduling rule that minimizes conflicts between recognized competitions." (Doc. No. 288). USEF further contends that use of mileage as a calender coordinating means, especially where horses are concerned, "is a very good and objective way of doing it."  (Doc. No. 289, Exh. 5, Balch Dep., pp. 83 - 84).  Plaintiffs do not dispute that the Mileage Rule minimizes scheduling conflicts between competitions, rather, Plaintiffs contend that the Mileage Rule has anticompetitive effects.  However, USEF's Mileage Rule and its enforcement thereof, is exactly the type of action which the Amateur Sports Act directs, that is, "the monolithic control of an amateur sport by the NGB for that sport." Id. at 529.

In Eleven Line Inc v. North Texas State Soccer Ass'n, 213 F.3d 198 (5th Cir. 2000), one of the few cases examining antitrust liability under the Amateur Sports Act, the Court rejected the application of the implied immunity doctrine and distinguished the facts of the case from Behagen.  However the Eleven Line court based its rejection in large part upon the fact that the United States Soccer Federation ("USSF"), the national governing body, had not issued the rule in question or explicitly approved of it.  The Eleven Line court acknowledged that "[a]lthough the facts of this case do not support an implied exemption from the antitrust laws, an implied exemption would be appropriate in many other situations."  Eleven Line, 213 F.3d at 204.  In the case before this Court, USEF as the national governing body of equestrian sport, specifically approved of the Mileage Rule and was aware of its consequences, i.e., that it may preclude a promoter from obtaining a Recognized Competition on a desired date.

Plaintiffs urge this Court to consider the history of the Mileage Rule, and its waiver provision[17], to determine if there might be a less exclusionary means to carry out the scheduling purpose of the Amateur Sports Act.  This approach ignores the existing federal case law on implied immunity under the Amateur Sports Act which acknowledges that a national governing body may exert monolithic control, i.e., Behagen and Eleven Line.  This Court finds that like the player eligibility rule exempted under Behagen, the Mileage Rule should be exempted and Plaintiffs' antitrust claims against USEF should be barred since USEF's Mileage Rule minimizes

_____

[17] With respect to Plaintiffs' argument that the Mileage Rule does not minimize scheduling conflicts since it permits a promoter to "waive" a mileage conflict, this Court notes that under the January 2005 rule changes, USEF has ultimate control over all waivers (Doc. No. 289, Exh. 1, Long Decl., Exh. C thereto).  Furthermore, to the extent Plaintiffs argue that under the January 2005 rule changes, the only modification is that USEF must give prior approval to "the incumbent promoters' veto power," this bolsters the presumption that the Mileage Rule is necessary.  Specifically, incumbent promoters may not "dispense" with the Mileage Rule simply because it suits their purposes.

scheduling conflicts and implements Congress' intent with regard to the governance of amateur athletics.  Likewise, Plaintiffs' claims against the Promoter Defendants are barred based upon their membership in USEF and/or conduct in compliance with, and pursuant to, the rules and regulations of USEF.  In summary, Defendants are entitled to summary judgment on all of Plaintiffs' claims under the doctrine of implied immunity.

**2.      Standing**

The HITS Defendants and Stadium Jumping Defendants contend[18] that Plaintiffs lack standing to bring the claims asserted in the Third Amended Complaint because they have not suffered the type of injury to business or property contemplated by the Sherman Act.  Plaintiff JES[19] responds that it does have standing since it "attempted to enter the Relevant Market for many years" and that "each attempt was precluded by application of the Mileage Rule." Standing is a question of law for the Court to decide.  See Todorov v. DCH Healthcare Authority, 921 F.2d 1438, 1448 (11th Cir. 1991).  "Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." Id.  The Eleventh Circuit has identified a two-pronged approach to determine whether a plaintiff has antitrust standing.  To be a proper party, a plaintiff must have suffered an antitrust injury and must be an efficient enforcer of the antitrust laws.  See id. at 1449; see also Levine v. Central Florida Medical Affiliates, Inc., 864 F. Supp. 1175, 1178 (M.D. Fla. 1994).

**a.      Antitrust Injury**

Antitrust injury is defined as:

---

[18]The Burton Defendants join in this argument.

[19]Plaintiffs' Response to Motions for Summary Judgment incorrectly states that Defendants do not challenge Plaintiff Gallagher's standing to sue.

> injury of the type the antitrust laws were intended to prevent and that flows
> from that which makes the defendants' acts unlawful.  The injury should reflect
> anticompetitive effect either of the violation or of anticompetitive effects
> made possible by the violation.  It should be, in short, the type of loss that the
> claimed violation would be likely to cause.

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  That is, an antitrust

plaintiff must show that his own injury coincides with the public detriment tending to result from

the alleged violation.  See Todorov, 921 F.2d at 1450; see also Amey, Inc. v. Gulf Abstract &

Title, Inc., 758 F.2d 1486, 1493 (11th Cir. 1985).

In the case before this Court, Gallagher seeks the profits that he claims he would have

made promoting A-Rated Shows during the period within which he was precluded from

conducting such shows by reason of the Mileage Rule and the Promoter Defendants' failure to

waive the Mileage Rule.  JES likewise seeks the profits it claims that it would have made in

promoting A-Rated Shows during the period within which it was precluded from conducting

such shows.  Additionally, JES and Gallagher seek the profits they claim they would have made

on housing developments they would have built had they not been precluded from holding A-

Rated Shows in the Relevant Market.  Plaintiffs further allege that they are harmed by the

Mileage Rule in that they cannot offer greater than $10,000 in prize money at the unrated shows

that the Mileage Rule restricts them to in the Relevant Market.

In essence, Plaintiffs complain of injury largely to themselves not injury that inures to the

public detriment.  This is not antitrust injury.  The antitrust laws were enacted for the protection

of competition, not the competitors.  See Brunswick, 429 U.S. at 488.  In their Response to the

Motions for Summary Judgment,  Plaintiffs allege the Mileage Rule has caused harm to

competition because it has (1) reduced the number of A-Rated Shows in the Relevant Market, (2)

increased the costs of participation in the incumbent shows, and (3) blocked potential new entrants from holding competing shows.  (Doc. No. 317,Exh. R, McAnneny Expert Report, filed under seal (S-2)).  There are few specific facts in the record to support these allegations, especially the allegation that the Mileage Rule has increased the costs of participation in the incumbent shows.  See Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985).  Furthermore, the only examples of "potential new entrants" who have been blocked from holding competing shows are the Plaintiffs themselves.  Lastly, while arguably the application of the Mileage Rule may have limited the number of A-Rated Shows in the Relevant Market, it is undisputed that there were at least 26 A-Rated Shows in the Relevant Market in 2004. (Doc. No. 317, Exh. R, McAnneny Expert Report, filed under seal (S-2)).

Furthermore, Plaintiffs allege damages equal to the profits they would have garnered had they been able to share in the Promoter Defendants' alleged monopoly profits.  This is not antitrust injury.  See Todorov, 921 F.2d at 1453.  Lastly, as to Plaintiffs' contention that they are entitled to profits they claim they would have made on housing developments, these damages are simply too remote and speculative to serve as a basis for any antitrust injury.  In summary, since Plaintiffs have not shown they suffered antitrust injury, they have no standing to assert their claims.

### b.      Efficient Enforcement of Antitrust Laws

To establish that it is an efficient enforcer of the antitrust laws, a plaintiff must meet the target area test.  "The target area test requires that an antitrust plaintiff both 'prove that he is within the sector of the economy endangered by a breakdown of competitive conditions in a particular industry' and that he is 'the target against which anticompetitive activity is directed."

Florida Seed Co. v. Monsanto Co., 105 F.3d 1372, 1374 (11th Cir. 1997)(quoting National

Indep. Theatre Exhibitors, Inc. v. Buena Vista Distribution Co., 748 F.2d 602, 608 (11th Cir.

1984)).

Since the Court has found that Plaintiffs suffered no antitrust injury, it need not and will

not address whether Plaintiffs would be efficient enforcers of the antitrust laws under the second

prong of the standing analysis.

**3.     Section 1 of the Sherman Act, 15 U.S.C. §1 (Count I)**

Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract,

combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce

among the several states, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. §1.

Broadly speaking, irrespective of the type of activity challenged, certain elements must be

established to prove a violation of section 1: (1) that an agreement exists between two or more

entities and (2) that the agreement unreasonably restrains trade.  See Torodov, 921 F.2d at 1455;

see also Boczar v. Manatee Hospitals & Health Systems, Inc., 731 F. Supp 1042, 1046 (M.D.

Fla. 1990); Weight-Rite Golf Corporation, et al. v. United States Golf Association, 766 F. Supp.

1104, 1108 (M.D. Fla. 1991); Tucci v. Smoothie King Franchises, Inc., 215 F. Supp. 2d 1295,

1301  (M.D. Fla.  2002).  As discussed below, the Court finds that Plaintiffs have failed to

establish either of the elements necessary to prove a violation of section 1 of the Sherman Act.

**a.     Contract, Combination or Conspiracy**

The threshold element of a section 1 claim is "concerted activity."  Mere unilateral

conduct is not violative of section 1.  See Copperweld Corp. v. Independence Tube Corp., 467

U.S. 752, 768 (1984); see also Levine, 72 F.3d at 1545.  Section 1 of the Sherman Act does not

prohibit independent business decisions but only prohibits concerted action and, thus, requires some agreement, express or implied, between two or more persons.  See Moecker v. Honeywell Int'l, Inc., 144 F. Supp. 2d 1291, 1300 (M.D. Fla. 2001)(citing Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984)).  It is well settled in the Eleventh Circuit that evidence of parallel business behavior, or even conscious parallelism, does not without more[20], constitute concerted activity.  See City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 570 (11th Cir. 1998).

The Promoter Defendants claim that Plaintiffs cannot demonstrate that the Promoter Defendants acted collusively in refusing to grant Plaintiffs' requests for waiver of the Mileage Rule.  The Court agrees that there is no record evidence that the Promoter Defendants' refusals to waive the Mileage Rule as to Plaintiffs' proposed A-Rated Shows were anything other than unilateral acts.  "The threshold requirement of every conspiracy claim, under both section 1 and section 2, is an agreement to restrain trade.  To prove that such an agreement exists between two or more persons, a plaintiff must demonstrate 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'"  Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1573 (11th Cir. 1991)(quoting American Tobacco Co. v. United States, 328 U.S. 781, 810 (1946)).  This Court recognizes that it will only be the rare case in which a plaintiff can establish the existence of a conspiracy by showing an explicit agreement and that most conspiracies are inferred "from the behavior of the alleged conspirators."  See id. However, antitrust law limits the range of permissible inferences from circumstantial or ambiguous evidence in a section 1 case.  See City of Tuscaloosa, 158 F.3d at 570.  To prove a

---

[20]At times referred to as "plus factors."

conspiracy, the circumstantial evidence must reasonably tend to exclude the possibility that the alleged conspirators acted independently.  See Seagood, 924 F.2d at 1574.

   With respect to Plaintiffs' contention that the record is "replete" with evidence of written agreements between the HITS Defendants and Stadium Jumping Defendants in which these Promoter Defendants continually agree to grant each other waivers of the Mileage Rule, this Court cannot infer from these agreements any conspiracy or "meeting of the mind" to exclude Plaintiffs from promoting A-Rated Shows in the Relevant Market.  Plaintiffs further contend that the NGB "held up their end of the bargain," and participated in the purported conspiracy, by assisting these Promoter Defendants over the years in the implementation of their agreement and denying any conflicting date applications from other promoters pursuant to the Mileage Rule. (Doc. No. 317).  However, Plaintiffs concede that the Stadium Jumping Defendants have from time to time granted Mileage Rule waivers to other longstanding horse show promoters in the Relevant Market.  (Doc. No. 317, Exh. C).  Plaintiffs further concede that "there is no direct evidence of collusion" among the HITS Defendants and Stadium Jumping Defendants in reaching their specific decisions to deny the Plaintiffs' waiver requests.  (Doc. No. 317).

   Here the evidence Plaintiffs rely upon for the proposition that this Court should infer a conspiracy only demonstrates that the HITS Defendants and the Stadium Jumping Defendants chose to do business with one another.  Furthermore, the evidence establishes that over the years the Stadium Jumping Defendants apparently opted to do business with Kernan Hodges and at least one of the Burton Defendants.  As to the Promoter Defendants,  "[i]t is well established that a party 'may choose with whom he will do business and with whom he will not do business' and that this behavior referred to as 'exclusive dealing,' will not give rise to liability absent a

showing of actual competitive injury." <u>See Seagood</u>, 924 F.2d at 1567 (citing <u>Construction</u>

<u>Aggregate Transp., Inc. v. Florida Rock Indus., Inc.</u>, 710 F.2d 752, 772-73 (1983)). Additionally,

the conduct of the NGB amounts to little more than enforcing its own rules and minimizing

scheduling conflicts as it is required to do.

Here Plaintiffs have presented no credible evidence by which this Court could find a

conspiracy. Circumstantial evidence in this case is insufficient to implicate the Promoter

Defendants in an agreement to exclude Plaintiffs from promotion of A-Rated Shows in the

Relevant Market. This is especially true since each Promoter Defendant, at most, admittedly

only has control of a limited number of weekend dates in the alleged Relevant Market and has no

control over the remaining dates. Furthermore, in denying the Plaintiffs' waiver requests, the

Promoter Defendants complied with the rules of the NGB. Therefore, an agreement between the

Defendants has not been established.

### b.        Unreasonable Restraint of Trade

Even if Plaintiffs were able to demonstrate concerted activity on the part of Defendants,

not every agreement that restrains competition will violate the Sherman Act. The Supreme Court

has determined that section 1 prohibits only those agreements that *unreasonably* restrain

competition. <u>See</u> <u>National Collegiate Athletic Ass'n v. Board of Regents of University of</u>

<u>Oklahoma</u>, 468 U.S. 85, 98 (1984); <u>see also</u> <u>Levine.</u>, 72 F.3d at 1545 (citing <u>Standard Oil Co. v.</u>

<u>United States</u>, 221 U.S. 1, 58 -64 (1911)). To determine whether an agreement unreasonably

restrains trade, courts have applied the rule of reason analysis and the *per se* analysis. <u>See</u>

<u>Boczar</u>, 731 F. Supp. at 1046. That is, "[a] restraint may be violative of the Sherman Act

because it is solely a naked restraint of trade so offensive to competition as to be unreasonable

*per se*, or because it runs afoul of the more detailed rule of reason inquiry." <u>Retina Associates,</u>

<u>P.A. v. Southern Baptist Hospital of Florida et al.,</u> 105 F.3d 1376, 1381 (11th Cir. 1997)(citing

<u>F.T.C. v. Indiana Fed'n of Dentists</u>, 476 U.S. 447, 458 (1986)).  Plaintiffs contend that the

application of the Mileage Rule by the Promoter Defendants as members of the NGB, in failing

to grant waiver requests to the Plaintiffs, requires this Court to undertake a *per se* analysis.  This

Court disagrees and finds the rule of reason analysis is applicable to Plaintiffs' claims.

### i.        Is the Mileage Rule *Per Se* Unreasonable?

Per se illegality is limited to four categories of trade restraints: (1) horizontal and vertical

price fixing; (2) horizontal market divisions; (3) group boycotts or concerted refusals to deal;

and (4) tying arrangements.  <u>See</u> <u>Moecker,</u> 144 F. Supp. 2d at 1301 (citing <u>Seagood Trading</u>, 924

F.2d at 1567).  Plaintiffs allege that through the use of the Federation's prize level restriction

within the Mileage Rule, Defendants have fixed, depressed and standardized the amount of

money that may be awarded at Recognized Horse Shows resulting in illegal price-fixing that is a

per se violation of section 1.  Third Am. Compl. ¶203.  Plaintiffs also allege that the agreement

of the Promoter Defendants to enforce the Mileage Rule is a horizontal allocation of markets that

is a per se violation of section 1.  Third Am. Compl. ¶204.  Plaintiffs further allege that "the

activity of the Defendants to cause the Federation to deny permission to Plaintiffs to compete in

the Relevant Market constitutes an illegal boycott that is a per se violation" of section 1.  Third

Am. Compl. ¶205.

However, in the Eleventh Circuit, "[t]he presumption in cases brought under section 1 of

the Sherman Act is that the rule-of-reason standard applies." <u>Seagood</u>, 924 F.2d at 1567.

Furthermore, there is substantial case law rejecting a *per se* approach in examining the action

taken by sporting associations.  See NCAA, 468 U.S. at 100-01; see also Cha-Car, Inc. v. Calder
Race Course, Inc., 752 F.2d 609, 613 (11th Cir. 1985); Hatley v. American Quarter Horse Ass'n,
552 F.2d 646, 652-53 (5th Cir. 1977).; Martin v. American Kennel Club, Inc., 697 F. Supp. 997,
1000 (N.D. Ill. 1988).  Since under a *per se* analysis there is no inquiry into possible
justifications for the challenged restraint, the *per se* doctrine should not be extended to restraints
that are of ambiguous effect.  See Cha-Car, 752 F.2d at 612-13.

"The decision to apply the *per se* rule turns on 'whether the practice facially appears to
be one that would always or almost always tend to restrict competition and decrease output."
Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co., 472 U.S. 284, 289-90
(1985)(quoting Broadcast Music, Inc. v. Columbia Broadcasting System, Inc. 441 U.S. 1, 19-20
(1979)).  The Mileage Rule as promulgated by USEF, including its prize money requirement,
and application thereof by the Promoter Defendants, is not a practice which facially appears to
be one that would always or almost always tend to restrict competition.

Therefore, the Court finds that Plaintiffs have failed to establish *per se* violations of the
Sherman Act and a "rule of reason" analysis should be applied.  Specifically, despite Plaintiffs'
efforts to couch Defendants' conduct in terms of traditionally per se illegal activities, the field of
sports is one "in which horizontal restraints on competition are essential if the product is to be
available at all."  See NCAA, 468 U.S. at 101.  That is, the self-regulation which is present here
by virtue of the operation of the NGB for equestrian sport exempts Defendants' conduct from
*per se* analysis.  See Cha-Car, 752 F.2d at 614 n.9.

**ii.     Is the Mileage Rule Unreasonable Under the Rule of Reason?**

"Under Eleventh Circuit case law, alleged Section One agreements analyzed under the rule of reason require a plaintiff 'to prove (1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct had no pro-competitive benefit or justification.'" Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc., 376 F.3d 1065, 1071 (11th Cir. 2004) (quoting Levine, 72 F.3d at 1551)); see also Retina Associates, 105 F. 3d at 1383 (requires proof that defendant's conduct had an anticompetitive effect in the relevant market, either by establishing actual anticompetitive effect or potential for genuine anticompetitive effect in defined geographic and product markets, and that no pro-competitive rationale would justify conduct).

The burden of proving an unjustified anticompetitive effect is on the Plaintiffs.  See Seagood, 924 at 1570.  However, since the Defendants do not specifically address whether the alleged violative conduct has restrained competition in the Relevant Market, for purposes of its rule of reason analysis, this Court will presume without finding that Plaintiffs have demonstrated an anticompetitive effect in the Relevant Market.  The Court must then determine whether the Defendants' conduct had any pro-competitive benefit or justification.  At the heart of this inquiry is the Mileage Rule itself.

Under the rule of reason analysis, this Court must evaluate the challenged rule in light of the factual context of the particular industry, the history of the restraint, and the reason for its imposition[21] in order to determine whether its anticompetitive effects outweigh its pro-competitive benefits. See National Society of Professional Engineers v. United States, 435 U.S.

---

[21]There is no evidence before this Court as to why the Mileage Rule was originally implemented.

679 (1978); see also Cooney v. American Horse Shows Ass'n, 495 F. Supp. 424, 431 (S.D.N.Y. 1980).  The record before this Court demonstrates the reasonableness of the Mileage Rule.

Plaintiffs suggest that the Mileage Rule has no purpose other than to effect some sort of elaborate scheme whereby they are precluded from acquiring their desired dates to promote A-Rated Shows in the Relevant Market.  Specifically, Plaintiffs contend "[t]he Mileage Rule has no purpose other than to insure that incumbent promoters of shows covered by the Mileage Rule do not face any competition within a 250 mile radius, unless they are willing in the exercise of their unfettered discretion to tolerate a new entrant by granting a waiver from the Mileage Rule's monopoly grant."  Plaintiffs' assertion is not supported by the evidence before this Court.

The Mileage Rule has several pro-competitive functions relating to equestrian sport.  As discussed above, the Mileage Rule is an effective way to minimize scheduling conflicts.  USEF's Mission Statement states, in relevant part:

> As the National Governing Body (NGB) of Equestrian Sport in the United States we will inspire, encourage interest in, and regulate equestrian competition by ensuring the safety and well-being of the horses . . . promote the pursuit of excellence in equestrian sport from junior and grass roots programs to Olympic Games . . . [t]o accomplish this mission, our members and staff, working together will:
>
> (3)    Protect and support the welfare of horses by inspecting, monitoring and testing to deter use of forbidden substances and other cruel, unsafe and/or unsportsmanlike practices and by adopting and enforcing rules to prohibit such practices . . .
> (6)    Provide the strongest possible U.S. representation internationally . . .
> (12)   Serve as the coordinating body for equestrian activity in the United States . . .
> (13)   Coordinate the calender of competitions . . . and provide for varying levels of regional and national competition in a wide variety of disciplines to increase the breadth and depth of the sport throughout the country . . ..

(Doc. No. 305, pp. i-ii).  The Mileage Rule aids USEF in ensuring horses and United States athletes can compete at the highest levels both in the United States and internationally.

Specifically, the Mileage Rule disperses hunter and jumper competitions geographically, thereby making it more likely that the best athletes and horses will compete against one another.  (Doc. No. 289, Exh. 2, O'Connor Decl., ¶6, Doc. No. 289, Exh. 5, Balch Dep., pp. 111 - 112 and Doc. No. 289, Exh. 4, Long Dep., pp. 64 - 65).  A-Rated Shows attract the best athletes and horses. However, not a large number of horses and athletes can compete at the highest levels.  If there were numerous A-Rated Shows in close geographic proximity on the same days, as might occur without the Mileage Rule, it is less likely that the best horses and athletes would compete against each other as the top horses and athletes would instead be dispersed among those A-Rated Shows.  (Doc. No. 289, Exh. 2, O'Connor Decl., ¶6).

Furthermore, the Mileage Rule promotes the health and welfare of the horses by removing incentives for horse owners to overuse their horses by chasing "points" and prize money on the same or proximate days at multiple competitions in the same geographic area. (Doc. No. 289, Exh. 2, O'Connor Decl., ¶7, Doc. No. 289, Exh. 5, Balch Dep., pp. 112 - 113, 133 - 137 and Doc. No. 289, Exh. 3, O'Connor Dep., pp. 51 - 52).  Lastly, the Mileage Rule aids USEF in fostering the development of equestrian sport across the United States, not just in former regional centers such as the Northeast.  (Doc. No. 289, Exh. 5, Balch Dep., p. 111).

USEF, as the NGB for equestrian sport, utilizes the Mileage Rule to achieve several pro-competitive functions.  There is no evidence in the record that in denying the Plaintiffs' waiver requests, the Promoter Defendants as members did any more than abide by USEF's rules in operating their respective horse shows.  Furthermore, under the January 2005 rule changes, the Promoter Defendants will not have "unfettered discretion" to waive the Mileage Rule because USEF "shall determine whether it is in the best interest of the sport to either deny or grant the

waiver and under what terms and conditions such waiver shall be given." (Doc. No. 344, Exh. A, GR213).  Therefore, applying the rule of reason, the Court finds that under the facts of this case the Mileage Rule does not result in an unreasonable restraint of trade.

> **4.**        **Section 2 of the Sherman Act, 15 U.S.C. §2 (Counts II - IV)**

Section 2 of the Sherman Act is directed against "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."  15 U.S.C. §2. Broadly speaking, there are three distinct violations actionable under section 2 of the Sherman Act: (1) monopolization; (2) attempt to monopolize; and (3) conspiracy to monopolize.  In their Third Amended Complaint, Plaintiffs allege all three violations.

As an initial matter under the Court's section 2 analysis, USEF argues that it is entitled to summary judgment on Counts II - IV, as well as the related Florida state law claims (Counts VI, VII, VII, and IX (in part)), since it is not a competitor in the relevant market and because Plaintiffs' "shared monopoly" theory is unsupported by the facts and law.  This Court agrees that USEF is not a competitor in the Relevant Market.  According to Plaintiffs, the Relevant Market is A-Rated Shows in the state of Florida during the winter months.  It is undisputed that USEF is the NGB for equestrian sport in the United States and not a horse show promoter, operator or manager in this alleged market (Doc. No. 289, Long Decl., ¶17).  Nor is there any credible evidence in the record that the Promoter Defendants control or influence USEF.  Since USEF does not compete in the Relevant Market, USEF is entitled to summary judgment on Plaintiffs' section 2 claims based upon the argument that it does not compete in the Relevant Market.  See Aquatherm Industries, Inc. v Florida Power & Light Company, 145 F.3d 1258, 1261 (11th Cir.

1998); see also Spanish Broadcasting System, 376 F. 3d at 1075.  The Court will address

Plaintiffs' "shared monopoly" theory of liability in greater detail below.

Plaintiffs claim that Defendants have used USEF's protected status as a NGB to "create a

series of monopolies" in the Relevant Product Market.  The Court finds that Plaintiffs have failed

to present evidentiary support for the elements of their claims for monopolization offenses under

section 2 of the Sherman Act.

### i.        Monopolization (Count II)

To establish a claim for monopolization, plaintiffs must demonstrate that Defendants: (1)

possessed monopoly power in the relevant market and (2) willfully acquired or maintained that

power, as distinguished from growth or development as consequence of superior product,

business, acumen, or historic accident. See Morris Communications Corp. v. PGA Tours, Inc.,

364 F.3d 1288, 1293-94 (11th Cir. 2004)(citing United States v. Grinnell Corp., 384 U.S. 563,

570-71 (1966)).   "Monopoly power" is defined as "the power to control prices or exclude

competition in the relevant market."  United States v. E.I. duPont de Nemours & Co., 351 U.S.

377, 391 (1956).

Under a "shared monopoly" theory, Plaintiffs have alleged Defendants possess market

power.  Specifically, with respect to their monopolization claim under section 2 of the Sherman

Act, Plaintiffs allege that "[t]he Federation, together with the non-Federation Defendants and/or

other unnamed coconspirators, possess monopoly power in the Relevant Market due to their

control over available dates for Recognized Horse Shows under the Federation Rules."   Third

Am. Compl. ¶220.  The record evidence does not demonstrate that any individual Defendant had

the power to control prices or exclude competition from the market.   Rather, at most, the

Promoter Defendants possess what Plaintiffs have termed a "perfect and permanent serial" monopoly.  This is not sufficient to establish a claim for monopolization under section 2 of the Sherman Act.

The Eleventh Circuit has not directly addressed whether claims based on a "shared monopoly" may constitute a violation of section 2 of the Sherman Act.  In October 2003, in denying the then Defendants'[22] motions to dismiss Plaintiffs' amended complaint, this Court found that "the concept of a 'shared monopoly' cannot be excluded at this juncture" (Doc. No. 59).  At the summary judgment stage, however, the Court declines to accept the concept of a shared monopoly as a basis for section 2 liability under Plaintiffs' claims for monopolization and attempted monopolization.  Only section 2's conspiracy to monopolize claim targets concerted action.  See Carpet Group, Int'l v. Oriental Rug Importers Ass'n, 256 F. Supp. 2d 249, 283- 85 (D. NJ 2003); see also ID Security Systems, Inc. v. Checkpoint Systems, Inc., 249 F. Supp. 2d 622, 649 (E.D. Pa. 2003).

Even if this Court were to accept the concept of a shared monopoly, Plaintiffs have failed to set forth facts sufficient to establish that USEF and the Promoter Defendants share monopoly power in the Relevant Market.  Here we have a small Relevant Market, i.e., the state of Florida, in which numerous entities promote anywhere from 26 to 31 A-Rated Shows during the approximately seventeen (17) weeks that make up the winter months.  There is no evidence before this Court that any of the individual Promoter Defendants expanded or combined their

---

[22]David E. Burton, Sr., David E. Burton, Jr., Burtons and Sons, Inc., Littlewood Fences, Inc., Kernan Hodges, USA Equestrian, Inc., Bob Bell, Classic Company, Ltd. and North Florida Hunter & Jumper Association, Inc.

limited "perfect and permanent serial" monopolies to achieve market power in the Relevant Market.

     **ii.**     **Attempted Monopolization (Count III)**

     To establish a claim for attempted monopolization, plaintiffs must demonstrate: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). "Anticompetitive conduct is 'the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" Convad Communications Co. v. Bellsouth Corp, 299 F.3d 1272, 1283 (11th Cir. 2002), *vacated on other grounds*, 540 U.S. 1147 (2004),(quoting United States v. Griffith, 334 U.S. 100, 107 (1848)). "Proof of the intent element requires proof of 'a specific intent to destroy competition or build a monopoly.'" See Retina Associates, 105 F.3d at 1385 (quoting Times-Picayune Publishing Co. v. United States, 345 U.S. 594 (1953)). Plaintiffs allege that Promoter Defendants together have prevented competition from new Recognized Competitions because entities who submit timely applications to hold Recognized Competitions, accompanied by the applicable fees, do not have the same access to dates for Recognized Competitions as existing promoters and managers. The Court declines to accept the concept of a shared monopoly as a basis for section 2 liability under Plaintiffs' claim for attempted monopolization. Furthermore, Plaintiffs have failed to demonstrate that the Promoter Defendants engaged in predatory or anticompetitive conduct when they unilaterally refused to grant Plaintiffs' waiver requests. There is also insufficient evidence from which a jury could find that any of the Promoter Defendants acted with a "specific intent to monopolize" when they

unilaterally opted to adhere to the USEF rules.  Lastly, Plaintiffs do not point to any record

evidence supporting an inference that the Promoter Defendants' unilateral conduct created a

"dangerous probability" that they would succeed in achieving a monopoly.

### iii.    Conspiracy to Monopolize (Count IV)

To establish a claim for conspiracy to monopolize, plaintiffs must prove "(1) concerted

action deliberately entered into with the specific intent of achieving a monopoly; and (2) the

commission of at least one act in furtherance of the conspiracy." Moecker, 144 F. Supp. 2d. at

1310 (quoting Todorov, 921 F.2d at 1460 n.5).  See also ABA Section of Antitrust Law,

Antitrust Law Developments, p. 308 (5th ed. 2002); Thompson v. Metropolitan Multi-List, 934

F.2d 1566, 1582 (11th Cir. 1991).  A claim for conspiracy to monopolize does not require a

showing of monopoly power.  See Levine, 72 F.3d at 1555.

Since the most Plaintiffs can establish is that an individual promoter may have a "serial

monopoly" for its protected dates, which make up only a portion of the total number of dates

available for A-Rated Shows in the Relevant Market, no jury could find that an individual

promoter acted with a specific intent to monopolize the Relevant Market.  See Feldman v.

Jackson Mem'l Hosp., 571 F. Supp. 1000, 1010 - 11 (S.D. Fla. 1983).    Furthermore, as

discussed above in relation to section 1, the evidence before this Court does not demonstrate that

the Promoter Defendants acted in knowing concert or "conspired" when they individually

refused to grant the Plaintiffs' requested waivers of the Mileage Rule.

### 5.    Florida Antitrust Act, FLA. STAT.  §§542.18 and 542.19 (Counts V - VIII)

The Florida Antitrust Act provides that "[e]very contract, combination, or conspiracy in

restraint of trade or commerce in this state is unlawful."  FLA. STAT. §542.18 (2002).

Furthermore, "[i]t is unlawful for any person to monopolize, attempt to monopolize, or combine

or conspire with any other person or persons to monopolize any part of trade or commerce in this state." Flat. Stat. §542.19 (2002). "Federal and Florida antitrust laws are analyzed under the same rules and case law." <u>All Care Nursing Service, Inc. v. High Tech Staffing Services, Inc.</u>, 135 F.3d 740, 745 n.11 (11th Cir. 1998). "[T]he Florida legislature has, in effect, adopted as the law of Florida the body of antitrust law developed by the federal courts under the Sherman Act. <u>St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.</u>, 427 So. 2d 1028, 1032 (Fla. 2nd DCA 1984). Therefore, for the same reasons this Court has found no violation of the Federal antitrust laws, this Court finds that Plaintiffs have failed to establish the elements of a violation of FLA. STAT. §§542.18 and 542.19.

**6.** **Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. §§501.201 et seq. (Count IX)**

Count IX alleges violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). FLA. STAT. §501.201 et seq. FDUTPA provides that unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. FLA. STAT. §501.204(1). Sub-section 501.203(3) provides that a violation of the Federal Trade Commission Act constitutes a violation of FDUTPA. The law also provides that in construing this provision, great weight should be given to the interpretations of the Federal Trade Commission and the federal courts relating to §5(a)(1) of the Federal Trade Commission Act. FLA. STAT. §501.20(2). Unquestionably, antitrust claims fall within §5(a)(1) of the Federal Trade Commission Act. <u>See</u> <u>Indiana Fed'n of Dentists</u>, 476 U.S. at 454-55. Plaintiffs' FDUTPA claim is based on the same allegations as their

antitrust claims.[23]  Third Am. Compl. ¶262.  Therefore, for the same reasons this Court has found

no violation of the Federal antitrust laws, this Court finds that Plaintiffs have failed to establish

the elements of a violation of FLA. STAT. §501.201 et seq.

**IV.**   **Conclusion**

The Court finds that under the facts of this case there are no grounds under which

Plaintiffs are entitled to relief under the antitrust law.  See First National Bank of Arizona v.

Cities Service Co., 391 U.S. 253, 288 - 89 (1968).  Accordingly, it is **ORDERED AND**

**ADJUDGED** that:

(1)     Defendant United States Equestrian Federation, Inc.'s ("USEF") Motion for

Summary Judgment (Doc. No. 287) is **GRANTED**.  USEF's Request for Oral

Argument is **DENIED**.

(2)     Defendants', David E. Burton, Sr., David E. Burton, Jr., Burtons and Sons, Inc.

and Littlewood Fences, Inc. (collectively, "the Burton Defendants"), Motion for

Summary Judgment is (Doc. No. 290) is **GRANTED**.

(3)     Defendants', Thomas Struzzieri ("Struzzieri"), Horse Shows in the Sun, Inc.

("HITS") and Rose View Stables, Ltd. ("Rose View Stables")(collectively "the

HITS Defendants"), Motion for Summary Judgment (Doc. No. 292) is

**GRANTED**.

(4)     Defendants', Stadium Jumping, Inc. ("Stadium Jumping") and Eugene R. Mische

("Mische)(collectively, "the Stadium Jumping Defendants"), Motion for Entry of

Final Summary Judgment (Doc. No. 294) is **GRANTED**.

_____

[23]Plaintiffs concede that their FDUTPA claims "survive" or "fall" with their antitrust claims.

Defendants', Stadium Jumping, Inc. ("Stadium Jumping") and Eugene R. Mische ("Mische)(collectively, "the Stadium Jumping Defendants"), Request for Oral Argument (Doc. No. 295) is **DENIED**.

(5)     Since the Court has found Plaintiffs' claims are barred by the Defendants' implied immunity, all claims against Defendants Linda S. Aldrich and Fox Lea Farms, Inc. shall be dismissed.

(6)     The Pretrial Conference in the above-captioned matter which was previously scheduled for Friday, May 13, 2005, at 8:30 a.m. is hereby cancelled.

(7)     The Clerk is directed to enter judgment in favor of Defendants United States Equestrian Federation, Inc., David E. Burton, Sr., David E. Burton, Jr., Burton and Sons, Inc., Littlewood Fences, Inc., Thomas Struzzieri, Horse Shows in the Sun, Inc., Rose View Stables, Ltd., Stadium Jumping, Inc. and Eugene R. Mische and **CLOSE** this case.

**DONE AND ORDERED** at Tampa, Florida, this 9th day of May, 2005.

SUSAN C. BUCKLEW
United States District Judge

Copies to: Counsel of Record